BUDD, J. (concurring).
I agree with the court's holding. However, I write separately to describe more broadly the interest in "limit[ing] 'the appearance of corruption stemming from public **444 awareness of the opportunities for abuse inherent in a regime of large ... financial contributions' to particular candidates." McCutcheon v. Federal Election Comm'n, 572 U.S. 185, 207, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion), quoting Buckley v. Valeo, 424 U.S. 1, 27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In Massachusetts, this interest is rooted in the Declaration of Rights of the Constitution of the Commonwealth and supports the Commonwealth's statutory scheme of campaign contribution regulation as a whole. Under art. 5 of the Declaration of Rights, the Commonwealth has a constitutional interest in ensuring that its elected representatives are "substitutes and agents" of the people who act only in their interest.
1. Role of a representative under the Constitution of the Commonwealth. A basic principle of our Constitution (and of a republican form of government) is that representatives are to be chosen by the people to represent them and their interests. See Part II of the Constitution of the Commonwealth. The people, through the Constitution, established a legislative department comprised of legislators who are elected by the qualified voters inhabiting the districts that they represent. See id. at c. 1, §§ 2,3. The people also established an executive power exercised by the Governor.
*1194 Id. at c. 2. "The Governor is emphatically the Representative of the whole People, being chosen not by one Town or County, but by the People at large." An Address of the Convention for Framing a new Constitution for the State of Massachusetts Bay, to their Constituents, 13 (1780).
The Declaration of Rights further clarifies that the relationship between representatives and the people is an agency relationship. Art. 5 provides as a right:
"All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them."
See Opinion of the Justices, 160 Mass. 586, 594, 36 N.E. 488 (1894) (opinion of Holmes, J.) ("confidence is put in [the Legislature] as an agent ... of its principal[, the people]").
The core of the relationship between an agent and his or her principal is a duty of loyalty that the former owes the latter: the law "demands that the agent shall work with an eye single to the interest of his principal. It prohibits him from receiving any compensation **445 but his commission, and forbids him from acting adversely to his principal, either for himself or for others." McKinley v. Williams, 74 F. 94, 95 (8th Cir. 1896). See Attorney Gen. v. Henry, 262 Mass. 127, 132, 159 N.E. 539 (1928). Under art. 5, all governmental officials in the Commonwealth, as agents of the people, are bound to "work with an eye single to the interests" of their principal, the public.[1] McKinley, supra at 95.
2. Campaigns for elected office. Over the past century, the cost **446 of running a feasible campaign for elected office, even *1195 for local positions, has increased dramatically. See Deeley, Campaign Finance Reform, 36 Harv. J. on Legis. 547, 550-551 (1999) ; R. Luce, Legislative Principles, The History and Theory of Lawmaking by Representative Government, 423-425 (1930). Most officials rely on campaign contributions to raise revenue in order to run a campaign. This system of financing generates a discrete category of principals, that is, a donor class,[2] separate and distinct from "the people." See art. 5 ; Bates v. Director of Office of Campaign & Political Fin., 436 Mass. 144, 165-166, 763 N.E.2d 6 (2002). Thus, the campaign finance system has created incentives for representatives to act not simply with the interests of the public in mind, but instead with an eye toward balancing the interests of the donors and the public, which may at times be divergent.[3]
3. General Laws c. 55. The prohibition on corporate campaign contributions set forth in G. L. c. 55, § 8, is one part of a broader scheme of statutes limiting and regulating campaign contributions set forth in that chapter. We have long held that some rights established by the Constitution may contemplate "suitable and reasonable regulations, not calculated to defeat or impair [that]
**447 right[,] ... but rather to facilitate and secure the exercise of the right." Capen v. Foster, 12 Pick. 485, 492, 29 Mass. 485 (1832). Article 5 guarantees the people a right to a republic in which their representatives are their substitutes and agents. To the extent that the lack of campaign finance regulation results in a system of government where representatives are increasingly forced to "work with an eye [not] single to the interest" of the public, McKinley, 74 F. at 95, campaign finance regulation and the limits on campaign contributions set forth in G. L. c. 55 may be appropriate to preserve the representative democracy contemplated by the *1196 framers of the Constitution ratified by the people of the Commonwealth in 1780.[4]
The prevention of criminal bribery alone does not sufficiently identify the Commonwealth's interest in its campaign contribution regulatory scheme. "[L]aws making criminal the giving and taking of bribes deal only with the most blatant and specific attempts of those with money to influence governmental action." Wagner v. Federal Election Comm'n, 793 F.3d 1, 15 (D.C. Cir. 2015), cert. denied sub nom. Miller v. Federal Election Comm'n, --- U.S. ----, 136 S.Ct. 895, 193 L.Ed.2d 789 (2016), quoting Buckley, 424 U.S. at 27-28, 96 S.Ct. 612. Thus, I believe that the Commonwealth's campaign finance regulation may be justified not only to prevent corruption in the form of criminal bribery or the appearance of criminal bribery, but also to prevent the appearance of corruption by preserving the agency relationship between representatives and the people set forth under **448 art. 5.[5]
The statute at issue in this case facilitates and helps secure the agency relationship between the people and their representatives as principals and agents, to take a step in the direction of preserving the constitutional directive that when elected officials act, their primary motivations are the interests of their principals, i.e., their constituents and the Commonwealth.[6]
*1197 The statutory scheme of G. L. c. 55, which provides for the disclosure and regulation of campaign contributions, is derivative of principles in the Massachusetts Constitution regarding the structure of our representative democracy and rights of its people. However, any encroachment on the rights of the plaintiffs under the First Amendment to the United States Constitution, even one that occurs by operation of the State Constitution, must be supported by a "sufficiently important interest."[7] McCutcheon, 572 U.S. at 197, 134 S.Ct. 1434 (plurality opinion), quoting Buckley, 424 U.S. at 25, 96 S.Ct. 612. The Commonwealth's interests in facilitating and securing the art. 5 right to representatives who are "substitutes and agents" of the people is "a sufficiently important concern" and "critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent."
**449 Buckley, supra at 27, 96 S.Ct. 612, quoting United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973). The Commonwealth may limit the serious burden that, in many instances, campaign contributions impose on the agency relationship between the public and their representatives because that burdened agency relationship highlights "the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions' to particular candidates." McCutcheon, 572 U.S. at 207, 134 S.Ct. 1434 (plurality opinion), quoting Buckley, 424 U.S. at 27, 96 S.Ct. 612.[8] Indeed, the interest concerns the form and character of our representative democracy itself.
Corporations such as 1A Auto, Inc., and 126 Self Storage, Inc., have free speech rights to educate and inform public discussion about issues of concern to them. See Citizens United v. Federal Election Comm'n, 558 U.S. 310, 342, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) ; First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 795, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Both *1198 entities have a First Amendment right to make unlimited independent expenditures throughout the Commonwealth to influence directly the thoughts and opinions of the voters and the public at large. Citizens United, supra at 365-366, 130 S.Ct. 876. See G. L. c. 55, § 18A ; 970 Code Mass. Regs. §§ 1.04(12) n.1, 2.17 (2018). However, that right does not extend so far as to provide funds directly to candidates that cause those candidates to "work with an eye [not] **450 single to the interest" of the people. McKinley, 74 F. at 95.[9]
6. Conclusion. In Thoughts on Government (1776), John Adams explained:
"The principal difficulty lies, and the greatest care should be employed, in constituting this representative assembly. It should be in miniature an exact portrait of the people at large. It should think, feel, reason, and act like them. That it may be the interest of this assembly to do strict justice at all times, it should be an equal representation, or, in other words, equal interests among the people should have equal interests in it. Great care should be taken to effect this, and to prevent unfair, partial, and corrupt elections. Such regulations, however, may be better made in times of greater tranquility than the present; and they will spring up themselves naturally, when all the powers of government come to be in the hands of the people's friends. At present, it will be safest to proceed in all established modes, to which the people have been familiarized by habit."
These principles support the court's conclusion in this case.

126 Self Storage, Inc.

See Alaska Stat. § 15.13.074(f) ; Ariz. Rev. Stat. § 16-916(a) ; Ark. Const. art. 19, § 28 ; Colo. Const. art. XXVIII, § 3 ; Conn. Gen. Stat. §§ 9-601, 9-613, 9-614 ; Mich. Comp. Laws § 169.254 ; Mo. Const. art. VIII, § 23.1; Mont. Code Ann. § 13-35-227 ; N.C. Gen. Stat. Ann. § 163A-1430 ; N.D. Cent. Code §§ 16.1-08.1-01 ; 16.1-08.1-03.3, 16.1-08.1-.03.5(1); Ohio Rev. Code Ann. § 3599.03 ; Okla. Stat. tit. 21, § 187.2 ; 25 Pa. Cons. Stat. § 3253; R.I. Gen. Laws. § 17-25-10.1 ; Tex. Elec. Code Ann. § 253.094 ; Wis. Stat. § 11.1112 ; Wyo. Stat. Ann. § 22-25-102(a).

See Iowa Code §§ 68A.102(17), 68A.503(1) ; Ky. Rev. Stat. Ann. §§ 121.025 ; Minn. Stat. § 211B.15 ; W. Va. Code § 3-8-8.

The permissible interest in preventing corruption is more precisely an interest in preventing quid pro quo corruption. See McCutcheon, 572 U.S. 185, 207, 134 S.Ct. 1434, 188 L.Ed.2d 468 (2014) (plurality opinion) ("Congress may target only a specific type of corruption -- 'quid pro quo' corruption"). Quid pro quo corruption "captures the notion of a direct exchange of an official act for money.... 'The hallmark of corruption is the financial quid pro quo: dollars for political favors.' " Id. at 1441, 637 N.E.2d 213 (plurality opinion), quoting Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). See Buckley v. Valeo, 424 U.S. 1, 26-27, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) ("To the extent that large contributions are given to secure a political quid quo pro from current and potential office holders, the integrity of our system of representative democracy is undermined").
As mentioned, the State also has a compelling interest in limiting "the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." McCutcheon, 572 U.S. at 207, 134 S.Ct. 1434 (plurality opinion), quoting Buckley, 424 U.S. at 27, 96 S.Ct. 612. See Buckley, supra, quoting United States Civil Serv. Comm. v. National Ass'n of Letter Carriers, AFL-CIO, 413 U.S. 548, 565, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973) ("Congress could legitimately conclude that the avoidance of the appearance of improper influence 'is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent' "). Such an appearance of corruption "erode[s] ... public confidence in the electoral process." Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 208, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982). Both corruption and the appearance of corruption "directly implicate 'the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process.' " Id., quoting UAW, 352 U.S. at 570, 77 S.Ct. 529.

The Supreme Court has also articulated a permissible government interest in anticircumvention. The court here relies on examples in the record of corporate campaign finance violations as indicative that § 8 is necessary as an anticircumvention measure. See ante at 434-435, 105 N.E.3d at 1186-1187. The court's reliance on anticircumvention is also questionable for two reasons. First, the continued validity of the anticircumvention rationale as a separate compelling government interest remains unclear after McCutcheon. See McCutcheon 572 U.S. at 211, 134 S.Ct. 1434 (plurality opinion) (stating that prevention of corruption and appearance of corruption is "only" legitimate government interest for restricting campaign finances, while skeptically referring to "Buckley's circumvention theory"). Second, to the extent it still is a valid interest, the court fails to indicate why individuals are more likely to attempt to circumvent individual contribution limits through a corporation than through a nonprofit or a union, and I discern nothing in the case law to suggest this.

I agree with the court that it is not necessary to address, in the context of this case, whether the Office of Campaign and Political Finance (OCPF)'s Interpretive Bulletin OCPF-IB-88-01 (Sept. 1988, rev. May 9, 2014) accurately interprets G. L. c. 55. Ante at note 10. I note, however, the current guidance appears to permit nonpolitical nonprofit organizations to contribute as much as $15,000 in one year directly to a single candidate. OCPF Interpretive Bulletin, supra at 4. I believe that when OCPF interprets G. L. c. 55, it should do so in light of art. 5.

However, principles similar to those contained in art. 5 may be implicit in the United States Constitution. See Brown & Martin, Rhetoric and Reality: Testing the Harm of Campaign Spending, 90 N.Y.U. L. Rev. 1066, 1071-1076 (2015).

Additionally, the Supreme Court has increasingly recognized that the Federal Constitution's grant of broad autonomy to States to structure their governments and adopt rules that make electoral democracy functional:
"Outside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments .... Indeed, the Constitution provides that all powers not specifically granted to the Federal Government are reserved to the States or citizens.... More specifically, 'the Framers of the [Federal] Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.' "
Shelby County, Ala. v. Holder, 570 U.S. 529, 543, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), quoting Gregory v. Ashcroft, 501 U.S. 452, 461-462, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). As in voting rights cases rooted in the First Amendment, perhaps in the regulation of campaign finance, to preserve the proper function of our democratic institutions, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role[;] ... 'as a practical matter, there must be substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process.' " Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), quoting Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974).

Furthermore, "it may be that, in some circumstances, 'large independent expenditures pose [some of] the same dangers ... as do large contributions.' " Federal Election Comm'n v. Wisconsin Right To Life, Inc., 551 U.S. 449, 478, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (opinion of Roberts, C.J.), quoting Buckley v. Valeo, 424 U.S. 1, 45, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). See also Buckley, supra at 46, 96 S.Ct. 612 ("independent advocacy ... does not presently appear to pose dangers ... comparable to those identified with large campaign contributions" [emphasis added] ).