# SUPREME COURT OF THE UNITED STATES

REPUBLICAN PARTY OF PENNSYLVANIA
20–542                         *v.*
VERONICA DEGRAFFENREID, ACTING SECRETARY
OF PENNSYLVANIA, ET AL.


JAKE CORMAN, ET AL.
20–574                         *v.*
PENNSYLVANIA DEMOCRATIC PARTY, ET AL.

ON PETITIONS FOR WRITS OF CERTIORARI TO THE SUPREME
COURT OF PENNSYLVANIA, MIDDLE DISTRICT

Nos. 20–542 and 20–574.   Decided February 22, 2021

The motions of Donald J. Trump for President, Inc. for
leave to intervene as petitioner are dismissed as moot.  The
motions of Thomas J. Randolph, et al. for leave to intervene
as respondents are dismissed as moot.  The motion of Hon-
est Elections Project for leave to file a brief as *amicus curiae*
in No. 20–542 is granted.  The motion of White House
Watch Fund, et al. for leave to file a brief as *amici curiae* in
No. 20–574 is granted.  The petitions for writs of certiorari
are denied.

JUSTICE THOMAS, dissenting from the denial of certiorari.

The Constitution gives to each state legislature authority
to determine the "Manner" of federal elections.  Art. I, §4,
cl. 1; Art. II, §1, cl. 2.  Yet both before and after the 2020
election, nonlegislative officials in various States took it
upon themselves to set the rules instead.  As a result, we
received an unusually high number of petitions and emer-
gency applications contesting those changes.  The petitions
here present a clear example.  The Pennsylvania Legisla-
ture established an unambiguous deadline for receiving
mail-in ballots: 8 p.m. on election day.  Dissatisfied, the
Pennsylvania Supreme Court extended that deadline by

three days.  The court also ordered officials to count ballots received by the new deadline even if there was no evidence—such as a postmark—that the ballots were mailed by election day.  That decision to rewrite the rules seems to have affected too few ballots to change the outcome of any federal election.  But that may not be the case in the future.  These cases provide us with an ideal opportunity to address just what authority nonlegislative officials have to set election rules, and to do so well before the next election cycle.  The refusal to do so is inexplicable.

I

Like most States, Pennsylvania has a long history of limiting the use of mail-in ballots.  But in October 2019, the Pennsylvania Legislature overhauled its election laws.  Relevant here, it gave all voters the option of voting by mail, and it extended the deadline for officials to receive mail ballots by several days to 8 p.m. on election day.  2019 Pa. Leg. Serv. Act 2019–77.  Then, in response to COVID–19, the legislature again amended the law but decided not to extend the receipt deadline further.  See 2020 Pa. Leg. Serv. Act 2020–12.

Displeased with that decision, the Pennsylvania Democratic Party sued in state court.  It argued that the court could extend the deadline through a vague clause in the State Constitution providing, in relevant part, that "[e]lections shall be free and equal." Art. I, §5.  The Pennsylvania Supreme Court agreed.  On September 17, it held that this "free and equal" provision enabled the court to extend the deadline three days to accommodate concerns about postal delays.

Petitioners promptly moved for emergency relief, filing an application for a stay on September 28.  That application easily met our criteria for granting relief.   See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*).

Not only did parties on both sides agree that the issue warranted certiorari, but there also was no question that petitioners faced irreparable harm. See *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury'"). Petitioners further established a fair prospect of certiorari and reversal. For more than a century, this Court has recognized that the Constitution "operat[es] as a limitation upon the State in respect of any attempt to circumscribe the legislative power" to regulate federal elections. *McPherson* v. *Blacker*, 146 U. S. 1, 25 (1892). Because the Federal Constitution, not state constitutions, gives state legislatures authority to regulate federal elections, petitioners presented a strong argument that the Pennsylvania Supreme Court's decision violated the Constitution by overriding "the clearly expressed intent of the legislature." *Bush* v. *Gore*, 531 U. S. 98, 120 (2000) (Rehnquist, C. J., concurring). Despite petitioners' strong showing that they were entitled to relief, we divided 4–4 and thus failed to act. *Scarnati* v. *Boockvar, ante,* p. ___.

Four days later, petitioners filed the first of these petitions and moved to expedite consideration so the Court could decide the merits before election day. But by that time, election day was just over a week away. So we denied the motion to expedite even though the question was of "national importance" and there was a "strong likelihood that the State Supreme Court decision violates the Federal Constitution." *Republican Party of Pa.* v. *Boockvar, ante,* at 3 (statement of ALITO, J.).

II

Now that the petitions are before us under the normal briefing schedule, I see no reason to avoid them. Indeed, the day after we denied petitioner's motion to expedite in No. 20–542, the case became even more worthy of review.

The Eighth Circuit split from the Pennsylvania Supreme
Court, granting a preliminary injunction against an at-
tempt by the Minnesota Secretary of State to extend the
legislature's deadline to receive ballots by seven days.  *Car-
son* v. *Simon*, 978 F. 3d 1051, 1059–1060, 1062 (2020).  This
divide on an issue of undisputed importance would justify
certiorari in almost any case.  That these cases concern fed-
eral elections only further heightens the need for review.

                              A

   Elections are "of the most fundamental significance un-
der our constitutional structure."  See *Illinois Bd. of Elec-
tions* v. *Socialist Workers Party*, 440 U. S. 173, 184 (1979).
Through them, we exercise self-government.  But elections
enable self-governance only when they include processes
that "giv[e] citizens (including the losing candidates and
their supporters) confidence in the fairness of the election."
See *Democratic National Committee* v. *Wisconsin State Leg-
islature*, *ante*, at 3 (KAVANAUGH, J., concurring in denial of
application to vacate stay); accord, *Purcell* v. *Gonzalez*, 549
U. S. 1, 4 (2006) (*per curiam*) ("Confidence in the integrity
of our electoral processes is essential to the functioning of
our participatory democracy").
   Unclear rules threaten to undermine this system.  They
sow confusion and ultimately dampen confidence in the in-
tegrity and fairness of elections.  To prevent confusion, we
have thus repeatedly—although not as consistently as we
should—blocked rule changes made by courts close to an
election.  See *Purcell*, *supra*.[1]

————————
   [1] See also *Merrill* v. *People First of Ala.*, *ante*, p. ___ (*Merrill II*); *Andino*
v. *Middleton*, *ante*, p. ___; *Merrill* v. *People First of Ala.*, 591 U. S. ___
(2020) (*Merrill I*); *Republican National Committee* v. *Democratic Na-
tional Committee*, 589 U. S. ___ (2020) (*per curiam*); *Veasey* v. *Perry*, 574
U. S. 951 (2014); *North Carolina* v. *League of Women Voters*, 574 U. S.
927 (2014) (allowing enjoined provisions to remain in effect for the up-
coming election).

An election system lacks clear rules when, as here, different officials dispute who has authority to set or change those rules. This kind of dispute brews confusion because voters may not know which rules to follow. Even worse, with more than one system of rules in place, competing candidates might each declare victory under different sets of rules.

We are fortunate that the Pennsylvania Supreme Court's decision to change the receipt deadline for mail-in ballots does not appear to have changed the outcome in any federal election. This Court ordered the county boards to segregate ballots received later than the deadline set by the legislature. Order in *Republican Party of Pa.* v. *Boockvar*, No. 20A84. And none of the parties contend that those ballots made an outcome-determinative difference in any relevant federal election.

But we may not be so lucky in the future. Indeed, a separate decision by the Pennsylvania Supreme Court may have already altered an election result. A different petition argues that after election day the Pennsylvania Supreme Court nullified the legislative requirement that voters write the date on mail-in ballots. See Pet. for Cert., O. T. 2020, No. 20–845. According to public reports, one candidate for a state senate seat claimed victory under what she contended was the legislative rule that dates must be included on the ballots. A federal court noted that this candidate would win by 93 votes under that rule. *Ziccarelli* v. *Allegheny Cty. Bd. of Elections*, 2021 WL 101683, \*1 (WD Pa., Jan. 12, 2021). A second candidate claimed victory under the contrary rule announced by the Pennsylvania Supreme Court. He was seated.

That is not a prescription for confidence. Changing the rules in the middle of the game is bad enough. Such rule changes by officials who may lack authority to do so is even worse. When those changes alter election results, they can severely damage the electoral system on which our self-

governance so heavily depends. If state officials have the
authority they have claimed, we need to make it clear. If
not, we need to put an end to this practice now before the
consequences become catastrophic.

### B

At first blush, it may seem reasonable to address this
question when it next arises. After all, the 2020 election is
now over, and the Pennsylvania Supreme Court's decision
was not outcome determinative for any federal election.

But whatever force that argument has in other contexts,
it fails in the context of elections. For at least three reasons,
the Judiciary is ill equipped to address problems—includ-
ing those caused by improper rule changes—through post-
election litigation.

First, postelection litigation is truncated by firm time-
lines. That is especially true for Presidential elections,
which are governed by the Electoral Count Act, passed in
1887. That Act sets federal elections for the day after the
first Monday in November—last year, November 3. See 3
U. S. C. §1. Under a statutory safe-harbor provision, a
State has about five weeks to address all disputes and make
a "final determination" of electors if it wants that decision
to "be conclusive." §5. Last year's deadline fell on Decem-
ber 8, and the Electoral College voted just six days later.
§7. Five to six weeks for judicial testing is difficult enough
for straightforward cases. For factually complex cases,
compressing discovery, testimony, and appeals into this
timeline is virtually impossible.

Second, this timeframe imposes especially daunting con-
straints when combined with the expanded use of mail-in
ballots. Voting by mail was traditionally limited to voters
who had defined, well-documented reasons to be absent.
See, *e.g.,* Moreton, Note, Voting by Mail, 58 S. Cal. L. Rev.
1261, 1261–1264 (1985). In recent years, however, many
States have become more permissive, a trend greatly accel-
erated by COVID–19. In Pennsylvania, for example, mail-

in ballots composed just 4% of ballots cast in 2018. But the legislature dramatically expanded the process in 2019, thereby increasing the mail-in ballots cast in 2020 to 38%.

This expansion impedes postelection judicial review because litigation about mail-in ballots is substantially more complicated. For one thing, as election administrators have long agreed, the risk of fraud is "vastly more prevalent" for mail-in ballots. Liptak, Error and Fraud at Issue as Absentee Voting Rises, N. Y. Times, Oct. 6, 2012. The reason is simple: "[A]bsentee voting replaces the oversight that exists at polling places with something akin to an honor system." *Ibid.* Heather Gerken, now dean of Yale Law School, explained in the same New York Times article that absentee voting allows for "simpler and more effective alternatives to commit fraud" on a larger scale, such as stealing absentee ballots or stuffing a ballot box, which explains "'why all the evidence of stolen elections involves absentee ballots and the like.'" *Ibid.* The same article states that "[v]oting by mail is now common enough and problematic enough that election experts say there have been multiple elections in which no one can say with confidence which candidate was the deserved winner." *Ibid.*

Pennsylvania knows this well. Even before widespread absentee voting, a federal court had reversed the result of a state senate election in Philadelphia after finding that the supposedly prevailing candidate "conducted an illegal absentee ballot conspiracy and that the [election officials] covertly facilitated the scheme with the specific purpose of ensuring a victory for" that candidate. *Marks* v. *Stinson*, 1994 WL 146113, *29, *36 (ED Pa., Apr. 26, 1994). This problem is not unique to Pennsylvania, and it has not gone away. Two years ago, a congressional election in North Carolina was thrown out in the face of evidence of tampering with absentee ballots. Because fraud is more prevalent with mail-in ballots, increased use of those ballots raises the likelihood that courts will be asked to adjudicate questions

that go to the heart of election confidence.[2]

Fraud is not the only aspect of mail-in ballots that complicates postelection judicial review. Also relevant are the corresponding safeguards that States put in place to ameliorate that heightened risk of fraud. To balance the "strong interest" of ballot access with the "'compelling interest in preserving the integrity of [the] election process,'" *Purcell*, 549 U. S., at 4, many States have expanded mail-in ballots but sought to deter fraud—and create mechanisms to detect it—by requiring voters to return ballots in signed, dated secrecy envelopes. Some States also require witness or notary signatures. Tallying these ballots tends to be more labor intensive, involves a high degree of subjective judgment (*e.g.*, verifying signatures), and typically leads to a far higher rate of ballot challenges and rejections. Litigation over these ballots can require substantial discovery and labor-intensive fact review. In some cases, it might require sifting through hundreds of thousands or millions of ballots. It also may require subjective judgment calls about the validity of thousands of ballots. Judicial review in this situation is difficult enough even when the rules are clear and the number of challenged ballots small. Adding a dispute about who can set or change the rules greatly exacerbates the problem.

Third, and perhaps most significant, postelection litigation sometimes forces courts to make policy decisions that they have no business making. For example, when an official has improperly changed the rules, but voters have already relied on that change, courts must choose between

---

[2] We are fortunate that many of the cases we have seen alleged only improper rule changes, not fraud. But that observation provides only small comfort. An election free from strong evidence of systemic fraud is not alone sufficient for election confidence. Also important is the assurance that fraud will not go undetected. Cf. *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 191, 206–207 (2014) (plurality opinion).

potentially disenfranchising a subset of voters and enforcing the election provisions—such as receipt deadlines—that the legislature believes are necessary for election integrity. That occurred last year. After a court wrongly altered South Carolina's witness requirement for absentee ballots, this Court largely reinstated the original rule, but declined to apply it to ballots already cast. *Andino* v. *Middleton*, *ante*, p. \_\_\_. Settling rules well in advance of an election rather than relying on postelection litigation ensures that courts are not put in that untenable position.

In short, the postelection system of judicial review is at most suitable for garden-variety disputes. It generally cannot restore the state of affairs before an election. And it is often incapable of testing allegations of systemic maladministration, voter suppression, or fraud that go to the heart of public confidence in election results. That is obviously problematic for allegations backed by substantial evidence. But the same is true where allegations are incorrect. After all, "[c]onfidence in the integrity of our electoral process is essential to the functioning of our participatory democracy." *Purcell*, *supra*, at 4; cf. *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 191, 206–207 (2014) (plurality opinion) (identifying a compelling interest in rooting out the mere "appearance of corruption" in the political process). An incorrect allegation, left to fester without a robust mechanism to test and disprove it, "drives honest citizens out of the democratic process and breeds distrust of our government." *Purcell*, *supra*, at 4.

## III

Because the judicial system is not well suited to address these kinds of questions in the short time period available immediately after an election, we ought to use available cases outside that truncated context to address these admittedly important questions. Here, we have the oppor-

tunity to do so almost two years before the next federal election cycle. Our refusal to do so by hearing these cases is befuddling. There is a clear split on an issue of such great importance that both sides previously asked us to grant certiorari. And there is no dispute that the claim is sufficiently meritorious to warrant review. By voting to grant emergency relief in October, four Justices made clear that they think petitioners are likely to prevail. Despite pressing for review in October, respondents now ask us not to grant certiorari because they think the cases are moot. That argument fails.

The issue presented is capable of repetition, yet evades review. This exception to mootness, which the Court routinely invokes in election cases, "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 735 (2008) (internal quotation marks omitted) (resolving a dispute from the 2006 election); see also *Anderson* v. *Celebrezze*, 460 U. S. 780, 784, and n. 3 (1983) (resolving a dispute from the 1980 election). Here, the Pennsylvania Supreme Court issued its decision about six weeks before the election, leaving little time for review in this Court. And there is a reasonable expectation that these petitioners—the State Republican Party and legislators—will again confront nonlegislative officials altering election rules. In fact, various petitions claim that no fewer than four other decisions of the Pennsylvania Supreme Court implicate the same issue.[3] Future cases will arise as lower state courts apply those precedents to justify intervening in elections and changing the rules.

––––––––––

[3] Pet. for Cert., O. T. 2020, No. 20–845 (challenging three decisions); Pet. for Cert., O. T. 2020, No. 20–810 (challenging one decision).

THOMAS, J., dissenting

\*  \*  \*

One wonders what this Court waits for. We failed to settle this dispute before the election, and thus provide clear rules. Now we again fail to provide clear rules for future elections. The decision to leave election law hidden beneath a shroud of doubt is baffling. By doing nothing, we invite further confusion and erosion of voter confidence. Our fellow citizens deserve better and expect more of us. I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

REPUBLICAN PARTY OF PENNSYLVANIA
20–542                              *v.*
VERONICA DEGRAFFENREID, ACTING SECRETARY
OF PENNSYLVANIA, ET AL.

JAKE CORMAN, ET AL.
20–574                              *v.*
PENNSYLVANIA DEMOCRATIC PARTY, ET AL.

ON PETITIONS FOR WRITS OF CERTIORARI TO THE SUPREME
COURT OF PENNSYLVANIA, MIDDLE DISTRICT

Nos. 20–542 and 20–574.   Decided February 22, 2021

JUSTICE ALITO, with whom JUSTICE GORSUCH joins, dissenting from the denial of certiorari.

I agree with JUSTICE THOMAS that we should grant review in these cases. They present an important and recurring constitutional question: whether the Elections or Electors Clauses of the United States Constitution, Art. I, §4, cl. 1; Art. II, §1, cl. 2, are violated when a state court holds that a state constitutional provision overrides a state statute governing the manner in which a federal election is to be conducted. That question has divided the lower courts,* and our review at this time would be greatly beneficial.

In the cases now before us, a statute enacted by the Pennsylvania Legislature unequivocally requires that mailed ballots be received by 8 p.m. on election day. Pa. Stat. Ann., Tit. 25, §§3146.6(c), 3150.16(c) (Purdon 2020). Nevertheless, the Pennsylvania Supreme Court, citing a provision of the State Constitution mandating that elections "be free and equal," Art. I, §5, altered that deadline and ordered

——————

*See *Pennsylvania Democratic Party* v. *Boockvar*, ___ Pa. ___, ___–___, 238 A. 3d 345, 369–372 (2020); *Carson* v. *Simon*, 978 F. 3d 1051, 1059–1060 (CA8 2020).

that mailed ballots be counted if received up to three days
*after* the election, *Pennsylvania Democratic Party* v. *Boock-
var*, ___ Pa. ___, ___–___, 238 A. 3d 345, 362, 371–372
(2020). *Both the state Republican and Democratic parties
urged us to grant review and decide this question before the
2020 election.* See Application for Stay in *Republican Party
of Pennsylvania* v. *Boockvar*, No. 20A54, pp. 2–3; Demo-
cratic Party of Pennsylvania Response to Application for
Stay in No. 20A54, pp. 8–9. But the Court, by an evenly
divided vote, refused to do so. Nos. 20A53 and 20A54, *ante*,
p. ___ (THOMAS, ALITO, GORSUCH, and KAVANAUGH, JJ.,
noting dissents). That unfortunate decision virtually en-
sured that this important question could not be decided be-
fore the election. See No. 20–542, *ante*, p. ___ (statement of
ALITO, J., joined by THOMAS and GORSUCH, JJ.).

Now, the election is over, and there is no reason for refus-
ing to decide the important question that these cases pose.
"The provisions of the Federal Constitution conferring on
state legislatures, not state courts, the authority to make
rules governing federal elections would be meaningless if a
state court could override the rules adopted by the legisla-
ture simply by claiming that a state constitutional provi-
sion gave the courts the authority to make whatever rules
it thought appropriate for the conduct of a fair election."
*Ante*, at 3; see also *Bush* v. *Palm Beach County Canvassing
Bd.*, 531 U. S. 70, 76 (2000) (*per curiam*). A decision in
these cases would not have any implications regarding the
2020 election. (Because Pennsylvania election officials
were ordered to separate mailed ballots received after the
statutory deadline, see *Republican Party of Pa.* v. *Boockvar*,
No. 20A84, *ante*, p. ___, we know that the State Supreme
Court's decision had no effect on the outcome of any election
for federal office in Pennsylvania.) But a decision would
provide invaluable guidance for future elections.

Some respondents contend that the completion of the
2020 election rendered these cases moot and that they do

not fall within the mootness exception for cases that present questions that are "capable of repetition" but would otherwise evade review. See, *e.g.*, *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 735–736 (2008). They argue that the Pennsylvania Supreme Court's decision "arose from an extraordinary and unprecedented confluence of circumstances"—specifically, the COVID–19 pandemic, an increase in mail-in voting, and Postal Service delays—and that such a perfect storm is not likely to recur. Brief in Opposition for Boockvar in No. 20–542, pp. 1, 9; see also Brief in Opposition for Pennsylvania Democratic Party in Nos. 20–542 and 20–574, p. 12.

That argument fails for three reasons. First, it does not acknowledge the breadth of the Pennsylvania Supreme Court's decision. That decision claims that a state constitutional provision guaranteeing "free and equal" elections gives the Pennsylvania courts the authority to override even very specific and unambiguous rules adopted by the legislature for the conduct of federal elections. See App. to Pet. for Cert. 47a (relying on the court's "broad authority to craft meaningful remedies when required" (internal quotation marks omitted)). That issue is surely capable of repetition in future elections. Indeed, it would be surprising if parties who are unhappy with the legislature's rules do not invoke this decision and ask the state courts to substitute rules that they find more advantageous.

Second, the suggestion that we are unlikely to see a recurrence of the exact circumstances we saw this fall misunderstands the applicable legal standard. In order for a question to be capable of repetition, it is not necessary to predict that history will repeat itself at a very high level of specificity. See *Federal Election Comm'n* v. *Wisconsin Right to Life, Inc.*, 551 U. S. 449, 463 (2007).

Third, it is highly speculative to forecast that the Pennsylvania Supreme Court will not find that conditions at the time of a future federal election are materially similar to

those last fall. The primary election for Pennsylvania congressional candidates is scheduled to occur in 15 months, and the rules for the conduct of elections should be established well in advance of the day of an election. We may hope that by next spring the pandemic will no longer affect daily life, but that is uncertain. In addition, the state court's decision was not based solely on the pandemic but was also grounded in part on broader concerns about the operation of the Postal Service, App. to Pet. for Cert. 34a–35a, 47a, and concerns of this nature may persist or resurface. As voting by mail becomes more common and more popular, the volume of mailed ballots may continue to increase and thus pose delivery problems similar to those anticipated in 2020.

For these reasons, the cases now before us are not moot. There is a "reasonable expectation" that the parties will face the same question in the future, see *Wisconsin Right to Life, Inc.*, 551 U. S., at 463, and that the question will evade future pre-election review, just as it did in these cases.

These cases call out for review, and I respectfully dissent from the Court's decision to deny certiorari.